On behalf of the Epelance, Jerome M. Marconi, on behalf of the Epelance, to the defense. On behalf of the defendants. In this division each side has approximately 15 minutes, but we don't look at our watches. It's a fairly straightforward case. I can assure you we've read the briefs and the pertinent portions of the record. And so it behooves you to get to your strongest point first, and you'll have time to reply. Anytime you're ready. Thank you, Your Honor. May it please the Court, Mr. Edwards. As this Court is well aware, you've held in many cases that the Fourth Amendment protects individuals from unreasonable searches of their persons, their homes, and their effects. Every search, every warrantless search, I should say, is deemed unreasonable unless it fits within one of the well-delineated exceptions. In this trial, most of the facts are undisputed. We know that the Hickory Hills Police were looking for this Patrick Tantillo. Patrick had sold them drugs months before. We know that the police never attempted to get an arrest warrant or a search warrant. We know that Tantillo had been at the Griffin home the day before for a barbecue, and that Tantillo's kids stayed overnight. We know that the defendant, Officer Byte, and his partner went to the Hampton Inn first in Crestwood to try to find this Tantillo, which then led them to the Griffin home. At the Griffin home, there was this plan, so to speak, put together where Officer Byte was going to go over the fence, go in the backyard to establish his perimeter. At no time did they plan on Officer Byte getting consent from the homeowners. Officer Byte did not believe he needed consent because he said he was only establishing the perimeter and that he had probable cause. Getting to the front door, and this part I want to quote directly from the trial testimony because Detective Hobart testified, quote, and I'm going to the conversation between Detective Hobart and John Griffin, who's the homeowner, quote, I asked him if it was okay if two of us stepped into the house to confirm that Patrick wasn't there. At that point, the stories diverge a little bit. We know the children were there. We know the dog was there. Everybody says that. According to the minor and according to John Griffin, John then turns to his son and says, take the dog and go in the backyard. He's creating this zone of safety in the backyard. There's a stockade fence around it. As you walk up to the driveway, no trespassing, private property, guard dog on duty. And he's doing so. First, he knows that Patrick's gone, so he gave Patrick's kids back to him. He saw Patrick drive away. Correct. So he's not trying to keep the cops out of the backyard to protect his property. No, he's trying to keep the cops out of the backyard so they're not attacked by the dog and they don't attack the dog. Is that right? Keep everybody safe. All right. And he doesn't want to, even though, how is that a violation of the Fourth Amendment, though? Again, he's saying, you go to both sides of the Florida versus the Hemino, and so the standard for measuring the scope of a suspect's consent, he's not really a suspect, under the Fourth Amendment, is that of objective reasonableness. What would a typical reasonable person have understood by the exchange between the officer and the suspect? In this case, Mr. Griffin. Right. Why wouldn't, so when he says, come into my house, it does say that, right? Come in, look for Patrick. Come in and look for him. Right. Why wouldn't he say, look, take a look at my backyard? At that point, at the very least, there's a question of fact. There's this issue of scope of consent. What is the scope of consent? The words that were expressed were, can the two of us come inside the house? Look at the actions of Mr. Griffin. I'm going to take my children, because I don't want them around the police while they're looking for Patrick. The children don't know anything about Patrick and what he did away from home. I'm going to take my dog, which is a big dog, and I'm going to put him in this area to make everybody safe and to keep my children away from these police who are going to be searching the house. I think looking at that, a reasonable jury can say, okay, I'm not giving you permission to go into the backyard. And, in fact, if you, in the record. Weren't they instructed, though, that, the jury now, that they could find that Mr. Griffin did not give consent to go in the backyard, and they could have found for Griffin on that, but where the directed verdict or the motion of the child, the six-year-old's Fourth Amendment rights in the backyard? Those are two different issues. The trial court directed out the minor, saying the minor doesn't have a reasonable expectation of privacy. That has nothing to do with consent. She just said, as a child in your backyard, you don't have a reasonable expectation of privacy. That's wrong. Going to the consent issue, I did the jury instruction, and the jury instruction was accurate. It said all searches are per se unreasonable. You can't go in my backyard unless you have a warrant or have consent. So, naturally, in the jury instruction, you have to put in that exception, and that's where I put in the language from People v. Himino and Michael C. v. Gressbach, that you've got to look at the communication between the official and the consenter. That was what was taken away. When you pull that consent out of the jury instruction, the defendant then got to argue. There was no search because I, as a police officer, I'm just going in this backyard to establish this perimeter. Excuse me, counsel. Wouldn't they have been able to argue that anyway? You're saying because of the court's ruling that if it wasn't for the court's ruling, they wouldn't have gotten to argue that? Yes. How is that? Because I was unable to argue the law to the jury about consent. One of the jurors sent out a note and said, does search of the home mean a search of the yard? So at least one of the jurors got it as far as what the issue was, but it wasn't in the instruction. So we went down a different road, and all they had to do is determine whether or not the search was reasonable, and that's not the legal standard. It's per se unreasonable unless the jury can go to this consent issue and say, well, wait a minute. You know, we had this conversation at the door where they said two of us. We had the actions of John Griffin putting everyone in the backyard. We had the actions of him moving around the house with the police to make sure they don't exceed the scope of the consent. Yeah, verify that Patrick Tantillo isn't here. So the jury never was instructed as to the law. But, counsel, isn't there a difference between searching and, as has been brought up in the briefs here, trying to make sure that someone doesn't run out the back? I mean, that's not a search. That's just sort of securing basically follow-up police work, isn't it? Isn't that different? Well, I think from the United States Supreme Court down, that is a search. And one of the cases that even if you violate or go past the threshold by a fraction of an inch and look at a non-intimate rug, that that's a search under the Fourth Amendment. So as soon as they enter onto the land, that is a search. They're invading the privacy. Also, I mean, common sense-wise, why is he back there? They're searching for Patrick Tantillo. No, he's there to prevent Patrick Tantillo from running out the back door and escaping. That's why cops go to alleys and backyards. That's exactly why. Right. We've got to find him first, and then if he runs, now I can stop him because I'm in the backyard. And what's interesting is the other detective who did not enter the yard was able to look through this wooden fence and he sees the dog. So I think he did the right thing in saying you have this six-foot wooden fence around the yard. Where is this bad guy going to go? I established a trial that he was overweight. I don't think he was a danger to anyone. You had him enclosed without even going into the yard. But he argued that. So the jury came back and rejected your theory of the case. The only thing they weren't allowed to consider, besides the non-IPI insertion then, was whether or not they should give additional monies to the child based on the child's expectation of privacy, which I'd suggest is very similar to the dad's expectation of privacy. So the issue of consent, the father could certainly give consent as to both. It's his house. You don't have six-year-olds may enter your yard. Right. And I think the case law is clear that when you have a child of tender age, the reasonable expectation of privacy flows from the adult. Correct. And I would agree with that. If the jury was properly instructed and came back and rejected the consent and said, well, we think based upon the actions of the parties, based upon the conversations, that there was consent, then I would agree at that point that the father can consent for the child. And I think the fact that the jury was not properly instructed, was not able to consider consent as it should have been in a legal argument to the jury, then that prevents or mitigates the argument in this case, well, the kid would have lost anyway, even if she didn't direct doubt based on the reasonable expectation of privacy. Are the parties in dispute as to what the officer said when he knocked on the door and talked to the homeowner? No. I don't have any dispute with the fact that Hobart asked can the two of us step inside your house. I don't have any dispute. Where the dispute starts is the police say the family was like one big happy family going around the house looking for Tantillo, whereas the minor and John Griffin and Kelly Taylor say that when we told them to go in the backyard, they went in the backyard. And we know the dog was back there because one, he was shot, and two, one of the other detectives saw the dog who was on the porch or the deck just before it ran around the house when Officer Byte was in the backyard. So I think as far as that initial conversation, no, there's not a big dispute. And I don't think there's also the issue about imputing consent, too, which I brought up, where you had Officer Byte along. He was at the fence. He could not see the front door. He could not hear the conversation at the front door. He relies on this officer we sit. We sit doesn't hear what's going on in the front door. So then you have the other legal issue. Can you impute consent? If I'm having a conversation regarding the scope of the consent, can you come in? Can you impute that to the person who can't see, hear, or know what's going on in the front door? Well, as he says through the hand signals, he did know that they had consent. And there are several cases, especially in Illinois. I think we're a little more liberal in this area in terms of rather than the federals. So, I mean, if you look at the federal case, U.S. v. Ellis on this, on imputation, and the leading case in Illinois, oh, that's the leading case out there on imputation. Right. Because anybody at the scene could say this. And, again, you're not questioning that the dad, Mr. Griffin, told the officers at the front door, yes, you can come in. Correct. Right. And I think the Ellis case, that's that whole collective knowledge doctrine when you're standing in probable cause. But if you look at Ellis, read it carefully, it says that the officers have to be in communication. And in Ellis, it was the Seventh Circuit that said that the three factors that the officers developed at the front door, which would have gave Rice probable cause, cannot be cobbled together with the observation of the officer at the side door who heard footsteps. And I think the Seventh Circuit ended up reversing the magistrate's decision to deny the motion to suppress and said you can't impute the knowledge unless these officers are in communication. I heard they said they were. Going back to what the case really is, all right, so there's no question Mr. Griffin knows his friend is gone. Mr. Griffin's done absolutely nothing wrong other than watching two children sleepover. See, it says, come into my house. Now, obviously, when he's saying that, Mr. Griffin is unaware there's a police officer in the backyard waiting in case the dope dealer runs out the back door. So he sends his kid and the dog out the back door if you believe his evidence. And there's reasons to believe that. And on the other side, the officer in the backyard does not know that Mr. Griffin has sent his 150-pound mastiff out the back door. And also the coppers inside haven't told anybody. By the way, he's letting a 150-pound dog in our partner. Had anybody thought this through, they wouldn't have done it this way. But that's what this is. This is not really a Fourth Amendment case. It's the idea of, listen, we're here. We want to look around for this guy that you said just left. Come on in. But then the dog gets killed, and they get $7,000 for the life of this dog. What other money other than $7,000 for the death of the dog would you expect to get had the trial court left in the 6-year-old's claim? Well, the 6-year-old, and there was evidence presented from the counselor, and there was a lot of testimony about how the 6-year-old started acting up, how he was after. He couldn't sleep. He was wetting his bed. They got him with a counselor. Was that based on emotional distress going on? Well, it could also flow from the violation of the Fourth Amendment. It could, but didn't you have that argument? Weren't you able to argue? Yes. And it was zero, correct? From intentional affliction of emotional distress, which is an intentional act, which I think from a plaintiff's perspective is a harder case to prove than proving that if the officers let the jury decide. If the officers violated the Fourth Amendment, if these damages flowed from that violation, if I came into your yard, and I did not have consent, and I didn't have a warrant, and I as a juror decided that there wasn't consent based upon what a typical reasonable person would have understood between this communication, then I could say, you know what? You damaged this minor. This minor had traumatic damages as a result from seeing his dog get shot in the top of the head, and then afterwards seeing the dog buried and all those kind of things. Well, there was no issue about the police had to shoot the dog, right? I mean, in terms of, I mean, was there a lot of argument or testimony saying, no, no, when the 150-pound dog ran at the police or ran in circles or whatever he did and got shot, he shouldn't have been shot. The police really should have tackled the dog, run away. Well, that's where you have the conflicting testimony. I mean, the dog is going to naturally run up because you're a stranger. The question is what happens at that point. The dog was shot in the top of the head, kind of between the eyes. I would infer that the dog had his head down. It wasn't consistent with what the officer said with the dog lunging at him. The minor testified that the dog didn't do anything. And the jury came back, and they did award money on the conversion count, so I have to infer from that there must have been something in the juror's mind to say he wasn't 100% non-negligent for killing this dog. Well, not surprisingly, there's a lot of case law, all the federal, which is surprising to me, on killing dogs by policemen serving search warrants. I mean, a lot of it. And the gist of it is that the risk of serious injury to death through the dogs or the policemen is considerable, and the law does not require the policeman to wait until the approaching animal was within biting distance or was leaping at him before taking protective action. And the fact that dogs big and of a combat breed is also something you would consider. Right. So, I mean, I'd suggest there's nothing else that the policeman in the backyard could have done other than shoot that dog. Now, whether he's right for doing so or whether the officers were wrong for not telling him, why is a dog going to be let out, get out of the backyard, is an argument. Right. And I would agree with that. Let's move the dog inside and say that Griffin gave the permission, we know, to have the officers come inside. Let's say the dog was in the living room. He makes an aggressive move toward the officer. There's no case because of the fact that the officers are rightfully there. They're there by consent. They're in the house, and they had to defend themselves. And I don't have a problem with that. But, you know, in this particular instance, I mean, it's probably part of the reason why the Fourth Amendment was there in the first place. I mean, let, you know, this is their castle. Let John Griffin did everything right. He comes from a police family. They don't have anything against police. Let's do everything right. Let's create the zone of safety for everybody. Let's take these two guys and just show them Tantillo's not here. And I think it was the violation, then, of the Fourth Amendment, going into a part of the house that you weren't invited, that you never asked to go. I mean, that wasn't on the table for John Griffin. I mean, you can't say that there's two of us, and we want to come inside. And I know the defense argument is, well, he didn't expressly limit it. Well, why should he? I mean, what they're putting on the table for him is the two of us want to come in and look around. Fine. Come on in. I'll follow you around. When the officers were given permission to come inside the house, how did they communicate this to the officers outside who were going in the backyard? They didn't. And that's part of the problem. And that's what created the safety risk. Because you had a situation where his name escapes me and starts with a W. The detective went to the side. He sees the dog. We know we have officers over on this side. We know we have officers in the house. They all had Nxtel phones. I mean, it's unbelievable that they weren't sitting there in communication with one another, and they knew there was a dog there before they showed up. They had to. Before they showed up, why would they know there was a dog before they arrived? Because when Officer Byte at trial testified, when he went to the fence to shake it. Once he gets there, you see a big sign. Guard dog. Right. And the dog run. But he still goes back there. So if you're walking up, you see a dog run, you see guard dog on duty, why don't you take out your radio, which is in your hand, and say, Hey, guys, what's going on in there? Or does anyone see a dog? Because guess what? His partner is looking at the dog. And that's what makes this case so incredible and so preventable. That's why he got $7,000. For the dog, but not for Jonathan. Right. And that's who kind of gets ripped off in this case is a 6-year-old who was doing nothing more than going in the backyard where he had a right to be with his swing set. And Mr. Griffin didn't do anything wrong either. There's no question about it. The homeowner did nothing wrong. Right. And, you know, granted, Mr. Griffin's damages might be a little different. He didn't have to go to counseling. You know, he didn't have all these problems that took years to work through. But, you know, it's the kid here that kind of gets ripped off by an improper jury instruction and by a finding that he didn't have a reasonable expectation of privacy. And, you know, the other issue, too, the Family Medical Expense Act, it was not allowed to bring in those damages. And I think with the Wills v. Foster case, I mean, the parents didn't have the money to pay out-of-pocket for a counselor. The kid needed the counseling. The counselor worked with him. Grandfather said, you know what, I'll write some checks. Pay me back if you get paid, if you get the money. I mean, that's what happened. And Wills v. Foster seems to say that a tortfeasor should not receive a windfall, and I think that was a Shriners Hospital that was providing free treatment. I was not able to present that claim to the jury. Was there any Illinois pattern in jury instruction that would have been appropriate? On the Fourth Amendment? Yes. No. I looked. I looked at the Seventh Circuit. I found one in the Ninth Circuit and then modified that a bit with other Ninth Circuit instructions. Unfortunately, you know, the Illinois IPI, you don't see many of these types of cases. I was even surprised in the Seventh Circuit not to see a pattern instruction on a search case. That's why I went to the Ninth Circuit and got the – I tried to get the instruction which was the least complicated, which just basically just, this is the law. And I think instruction number 24 was very uncomplicated, very to the point, and tracked the precise wording from the Supreme Court and the Fourth Amendment. And it should have been given. And for the life of me, I don't know why defense counsel would have objected to it, because that was their defense consent. I did this instruction for them. And even in the instruction conference, if you read the record, he says, I acknowledge that there's an issue about the scope of consent. He's saying that. But he objects to the reasonable, you know, what would a typical reasonable person. And, again, the trial court's memorandum order says scope of consent is an issue. So if it's an issue, then it should have been before the jury in a jury instruction. And I firmly believe that's reversible error. So, as you know, no party has a right to instruct a jury on an issue not raised during a proceeding. So you're saying that this was clearly raised during the proceedings. It was raised during the proceedings, during the jury instruction conference, in my motion for judgment notwithstanding the verdict. I again reminded the court that I objected to the fact that the jury wasn't advised or instructed on consent. And I said, if that's the case, if you're taking consent out of it, then it's a per se violation. Because now all the jury has to determine is whether there's a search. It helps you then, theoretically, right? I mean, if you put the number 24 in to help the defense, they don't want it. The judge agrees with them. Now it is per se. And you argue that, do you not? I probably did. But the problem is it wasn't the law given to them. Right. That's the problem. Yeah, I can argue it. But I don't have a piece of paper to say, you know, ladies and gentlemen, this is the law. Because the instruction that was given to them was, well, as long as it's reasonable. And it's not. You can't go in a house just because I'm looking for somebody. You know, I went in a house because I heard their toilet was filthy and I was concerned for these people. I wasn't searching for anything. That's a violation of the Fourth Amendment. You can't go in a yard. It's the same thing with the people versus Pukula with Pittman. You can't go in the yard. It's curtilage. And that's why it was difficult for me to argue this case, argue the law, because I didn't have the law in my hand to wave in front of their face to say, this is the law. They were misinstructed. So I appreciate it. One question. What is your best argument to rebut the proposition that borrowed money can never constitute family expenses? First of all, I don't think the statute of frauds would apply as a defense for a third party. I mean, perhaps if John Griffin decided to raise it when his grandfather was suing him. I think the trial testimony was they both acknowledged the debt. It's family members. And it just, common sense-wise, looking back on it, it doesn't make any sense, because what the court seemed to be saying, if the grandfather said, here's $1,000, John, go pay for the counseling, that's okay. But for the grandfather to write the check directly from his account to the counselor was wrong. And I just don't understand why that would prevent the Family Medical Expense Act claim, whereas if John paid it out of his pocket. I mean, whoever gets the loan from, you know, there was no insurance involved here. They're not going to cover this. So for those reasons, I think if the case does go back, I think, I mean, either I'll have John pay his grandfather back before the trial, or it would go back on, you know, with regard to the Family Medical Expense Act and the fact that he's a third party and the tortfeasor can't benefit from that.  We have time for reply. Mr. Edwards? I believe that there are eight issues the court is confronted with today. Some of these issues I'll just really just rest on the brief, and I'll handle very briefly just to make sure the panel doesn't have any questions. But the first issue that I think we need to deal with is the waiver issue, which really wasn't discussed at all in plaintiff's initial argument. The issue is whether or not the plaintiff waived the right to raise this jury instruction issue on appeal. And it's very curious to me, considering this is now sort of the central point of his appeal, and the law is really very clear in that regard. To preserve an issue for appeal, you need to include this issue in your post-trial motion. The plaintiff literally failed to do so. If the panel were to look at the post-trial motion, which is contained in the record, it would see literally no reference whatsoever to the jury instruction issue. We believe that he waived this issue for his failure to comply with his plain black letter law requirement. Unless the panel has any questions in that regard, I'll move on to the next issue, which is the standard of review. Obviously, I would be remiss if I didn't address the substance of his arguments with respect to the jury instruction. And the standard of review is one issue that we're really contesting. With respect to a jury instruction, the standard of review, the way the manner in which the Court of Appeals reviews a trial court's refusal to accept a jury instruction is for an abuse of discretion. Plaintiff's counsel tried to infer that the standard is actually de novo. And I believe the theory that he has put forth is that the failure to convey a certain instruction is tantamount to a failure to convey the law. And he states correctly that the failure to convey the correct law via the instructions may be reviewed de novo. But if you look at the cases that he cited in his brief, those cases, the issue really wasn't the acceptance or rejection of the jury instruction. In those cases, the issue was really with the law contained within the jury instruction. In those cases, the Courts of Appeals were really piercing through that initial question of whether it was proper to accept the instruction or reject the instruction, and they were actually looking to determine whether the law contained in the instruction was still good law.  In that situation, de novo review is appropriate. This situation is much different. This situation, the argument is, and we will argue, that the issue was not properly raised such that it became an issue for the jury. And therefore, it was not an abuse of discretion to refuse the instruction. And that's why we believe an abuse of discretion is the correct standard of review. Moving on to the substance of plaintiff's jury instruction argument. The trial court obviously has discretion to decide what issues are raised by the evidence and what issues are not. We contend and we submit that the scope of consent was actually not really an issue for the jury. It was not sufficiently raised in the evidence to become an issue for the jury. And there are two main reasons for that. One reason is because the police officer's conduct, his testimony, his statements about whether or not he believed that he had probable cause or whether it was necessary, all of this testimony really needs to be sort of swept aside. It shouldn't be considered in any event because it's really not relevant in a Fourth Amendment context. Police officers, we all know that police officers' conduct is judged by an objective reasonable to standard. So the question really has to do with whether or not the police officer's actions were reasonable, given the facts and circumstances known to them at the time of the alleged violation. So any of this testimony regarding officer bites, understandings, it really needs to be taken away in its entirety. And I think what we have left is we have Mr. Griffin, the plaintiff, saying, yes, come into my home. Look for this suspected cocaine dealer. I give you permission to attend to my property. Like I said, he really never limited the search in any way. Wait a minute. Wait a minute, counsel. Sure. Yes, come into my home. And as I'm letting you in my home, I'm going to make sure my big-sized dog doesn't attack you, doesn't cause trauma with you, the kids, and all of that. They're going to step in the backyard so that you can conduct your search for this drug dealer. Isn't that what happened? Well, if he stated it like that, and if that was actually the evidence, that would be one thing. I don't believe that the evidence really reflects that at all. Mr. Griffin states. Was the dog removed or not from the house? Mr. Griffin states the dog was. Counsel. Yes. Was the dog removed or not from the house? It's not exactly clear whether it was removed. What we do know is that. It was shot in the backyard. That's right. That's absolutely right. Did the dog leave the house? That's right. That's right. Thank you. And I think, of course, and my argument wasn't that it was in the house, but my argument was we're not sure whether it was in the backyard to begin with or whether it was removed afterwards. Mr. Griffin's testimony was I need to place my child and my dog in the backyard, and that was really a hotly contested issue, and that's the only thing I'm saying. There was a very serious debate over whether he actually made that statement, and it wasn't in, of course, the dog was in the backyard. There's no question about that. I would never argue that the dog was in the house. Was the dog in the house at one point? When officers came to the door, was the dog in the house? Again, I believe this is contested. I think that the evidence shows the dog was in the house, but the problem is what the officer or, excuse me, what Griffin told the officers. He says that I had to take my child and put him outside, but the officers said, no, well, that's not the case at all. The child was indoors. It was with the officers when they were conducting the search, and, again, that was really the hot topic, and that was fiercely debated between the parties. Oh, what you're saying, so they're saying that the child wasn't in the yard when the dog got shot? That's exactly correct. That's exactly right. And from what I just got from what you just said, that the dog may have been out there the whole time. That's your theory? That's possible. So this officer climbed in the back of this yard with a big old guard dog sign on it with this 150-pound mastiff and never said anything like, hey, guys, you know there's a monster dog out here? Well, Officer Byte didn't know that, yes, there was a sign. Officer Byte did not see the dog before he entered the backyard. And you don't think the dog would have seen him before that point? I don't believe the dog saw him, but what he did is he jumped over the fence and sort of crept around the side of the home, and only then when he turned the corner was he confronted with the dog. Well, isn't that more consistent with the dog being let out by Mr. Griffin after he gives the police consent to search his home? That's absolutely possible. And I'm not necessarily even arguing that Mr. Griffin did not let the dog out. I think the substance of my legal argument is the simple act of letting the dog out isn't sufficient as a matter of law to limit the scope to the interior of the home. It may not on a Fourth Amendment issue, but on a common sense issue I'd suggest it certainly does. Because, again, what else can Mr. Griffin do when he's got this large dog, which people are allowed to own, in his home, and now he's got strangers walking around through his home? He does apparently, I mean, absolutely I'd say the evidence would show, he does the right thing by letting the dog out in the backyard where he won't attack the two officers walking around in the house. Unfortunately, there's an officer in the back, unknown to Mr. Griffin, otherwise he wouldn't have let this dog in the backyard. But known to the two coppers who came in the front door. They know they're partners in the backyard. And so. No, that's absolutely correct. And I agree with that analysis 100%. And I do believe that that's why the jury found four of the plaintiffs on the conversion count and awarded them $7,000 for the loss of the dog. So I wouldn't disagree with that analysis one bit. My argument is simply that the scope of consent issue was not sufficiently raised as a matter of law to become a question for the jury. How were they instructed? The jury was instructed. Just as an issue of consent. They weren't instructed as an issue of consent. That's right. And again, our argument is simply that as a matter of law, the act of letting your dog into the backyard, and even if he stated I need to place my dog in the backyard, given his other testimony is not sufficient to limit the scope of the search in the interior of the home. He never actually limited the scope. That's clear. He never told the police officers don't go in the backyard. That's clear. I think a few cases should be considered. Counsel, before you get to the cases, you've just stated in our exchange here what a hotly contested issue the fact of whether or not this dog was out in the back and who gave consent to the dog to go back. So if that was such a hotly contested issue, yet you believe it shouldn't have gone to the jury? Well, Your Honor, I believe that the issue that I was referring to was actually whether or not the child was present in the backyard or inside with the officers at the time of the alleged search. But, Counsel, based on what you state and what the testimony appears to be, that's all wrapped up in whether or not the owner was taking a step and saying, you can come into my house as opposed to my backyard. So, I mean, that's all wrapped up together, isn't it? Yes. In a sense, yes. But, again, I think the argument is I don't believe that him stating, even let's assume arguendo that he said, yes, come into my house. Excuse me for a moment. I need to place my dog and my child in the backyard. Let's assume that that's exactly what he said. Even in that situation, the scope of consent still, I believe, would apply to the backyard. And the reason for that is because consent was obtained to search for a person at his property. And, obviously, a person could be found in the backyard. And there are really two cases that I think are particularly instructive. The first case is People v. Armstrong. And that case really deals with the ability of the homeowner or the person giving the consent to limit the scope of the search. In that case, the police officers were investigating a homicide. They knocked on the defendant's door and the defendant's roommate answered. The police officers entered the apartment and they sort of walked down the hallway and see the defendant hiding in the bathtub. The defendant ultimately tried to quash or suppress the arrest, arguing that the search exceeded the scope of the consent to enter. But what the court held in that case, they said, well, the homeowner never limited the search. They said, come in. And because the homeowner didn't limit the search, they held that the police were justified walking down the hallway. And that's obviously where they found the defendant. Now, the second case that I think is particularly instructive on this legal issue is People v. Rogers. People v. Rogers, in that case, the defendant called the police to investigate a burglary. Excuse me. Excuse me. Called the police to investigate a beating. When the police arrived at the property, the victim stated that the perpetrator had already fled from the scene and hadn't taken anything. Ultimately, the victim was transported to the hospital and the police stayed at the home and they literally conducted an inch-by-inch search of this person's home and eventually found drugs inside of a shoebox in a nightstand. They tried to introduce the drugs against the defendant, the homeowner, and it was suppressed. And the court stated that, you know, they discussed this concept of implied consent. They said, you call the police over to your home to investigate a beating. Surely the police had some sort of consent to conduct some search, yet that search needs to be tailored to what it is they're looking for and the issues and the reason that they were there in the first place. Therefore, the court stated that the police may have been justified in searching the room, in sort of doing a cursory search to make sure that no one was there, to make sure that another victim or the suspect wasn't hiding in the house. They would have been authorized to do that general cursory search. But what they did is they did an inch-by-inch exhaustive search and obviously a person can't hide inside of a shoebox in a nightstand. So you can see how the scope of the search vastly exceeded the reason they were there in the first place. And I think that that case really stands for the proposition that when consent to search for something is obtained, that search really should be tailored to the subject of the search. It should be tailored to the thing that they're looking for. Griffin knew that the police officers were looking for a person. He gave them consent to search for a person. And he knew that person wasn't there? That's absolutely correct. That's absolutely correct. But, again, we have to keep in mind, I would respectfully suggest that it's somewhat irrelevant because, again, in a Fourth Amendment perspective, in a Fourth Amendment analysis, the question is really were the officers' actions reasonable, given the facts and circumstances known to them at the time of the alleged violations. Counsel, before the officers approached the house, did they not have a plan that one or two officers were going to go around to the back and secure the back? Was there such a plan? Yes. Okay. Now, when the officer went to the front door and talked to Mr. Griffin and Mr. Griffin then gave him some form of permission to come into the house, how was whatever the officer said to Mr. Griffin or Mr. Griffin said to the officer, how was this relayed to the officers who were in the back? Sure. We discussed this in the brief thoroughly, but what happened was Sergeant Hobart received the consent and Officer Wiese was keeping an eye on Sergeant Hobart at the door and on Officer Byte. And what happened is when the consent to search was obtained, Officer Wiese sort of dropped his arm like this, and Officer Byte, when he saw the signal, only then did Officer Byte hop over the fence and enter the backyard. Okay, so there were no words spoken. That's correct. This was through some type of motion to the officers in the back that the officers were allowed to go in. That's exactly correct, and that was the plan all along, and I would suggest and I would submit that that certainly is sufficient to give them notice or impute that knowledge upon Officer Byte. And, in fact, this was second-party communication because the officer at the door communicated to someone else, a second person. The second person then gave a signal to the third person to go in the yard. That's exactly correct, and you can see how different this case is from United States v. Ellis. In Ellis, there was an officer who was standing by a side door who literally had no idea what was going on at the front. He heard some sort of shuffling inside the home, and he decided to break down the door. In that case, the court held that you can't use a suspicious conversation at the front to sort of justify this intrusion from someone who really had no idea whatsoever what was going on. This case is different because Officer Byte was notified that consent was obtained when he saw the hand drop. If the panel doesn't have any questions about the search issue, I think I'll move on to the seizure issue. And I really feel like we could rest in the brief in this matter. I think Justice Quinn really put it quite well when he said that there are a lot of these cases, we see a lot of these cases in federal courts, and a lot of these cases are resolved in summary judgment because the courts generally hold that if a dog is charging at you or running in circles or really making any sort of aggressive maneuver, we're not going to second-guess the judgment of the police officers, and we're going to say this is probably objectively reasonable. From a Fourth Amendment standpoint, the cases are very clear in that regard. So we believe certainly that the jury's verdict in that regard, that the seizure was not objectively unreasonable, should stand. Moving on to the directed verdict for a JT's claim. We submit that young JT did not have a privacy interest or expectation in the backyard. This case is sort of interesting because the homeowner, Mr. Griffin, was a plaintiff. He was able to assert the privacy interest in his own backyard. We don't believe that JT really had the same type of interest that the homeowner had. The case is that plaintiff cites. Why not? Because it's not his house. It would be one thing if the police searched his bedroom, which obviously, well, that happened, but which really gets to my next point, which is in any event, even if it was air, even if we assume, well, okay, let's assume that JT did have a privacy expectation, surely Griffin's conduct would, if his privacy expectation is gauged or it stems from Griffin's privacy expectation, well, surely Griffin's consent would apply to JT. So the jury instructed, could the jury conceivably, not factually, but were they instructed they could come back with a verdict for Mr. Griffin based on his expectation of privacy in the backyard? The jury was instructed on an unreasonable search and seizure claim. I believe that. Which involved a violation of the Fourth Amendment. That's correct. So if then the child, JT, had the same expectation as the father, which I suggest is more logical, the jury had that issue in front of them and rejected it as the father. That's correct. I agree. That's exactly right. The jury rejected the unreasonable search and seizure issue as the father. So surely, again, like I said, even if we assume that JT did have an expectation of privacy, I'm not sure that the law provides that, but even if we assumed it, surely it would have been harmless error because the jury, in any event, held that there was no unreasonable search or seizure. The next issue is the Family Medical Expense Act. Now, our argument is really quite simple. We believe that this is an issue of standing. The plaintiff argues that under the act the parents are liable for the expenses of the child. We generally don't disagree with that statement. However, Mr. James Taylor, a third party, paid JT's bills. And we know from the cases that plaintiff cites, we know that when a third party pays the bills of another person, not as a volunteer, then that third party has a subrogation interest. However, of course, in this case, Mr. Taylor did not file a lien. He was not added as a party. He did not assert his subrogation rights in any way, shape, or form. So I think that the notion that somehow Griffin should now be able to recover these expenses is misplaced. Now, I think plaintiff's main argument in this regard, his main response that we heard, is that the collateral source rule applies. He cites Wills v. Foster. Now, the collateral source rule, that really has to do with the ability of an injured party to be compensated, to be able to present the reasonable value of the medical services they receive. So the collateral source rule is applied in two ways. One way is to prevent the jury from hearing that Medicaid or an insurance company paid the bills, because I guess the idea is that if a jury hears that, they may say, well, the bills were paid anyway, so we don't really need to compensate them for that. That's improper. That's one of the purposes of the collateral source rule. The second purpose is to ensure — How is that different, counsel, from what just happened here? So he didn't have Medicare paid, and he didn't have Medicaid pay him. What he had was a grandfather concerned about his grandson's well-being, so he said, you know what, you don't have it right now, I'm going to pay. But instead of that, you know, coming into the same play and him being able to give his evidence as to the expenses as he would if it had been Medicare, you're saying, oh, it doesn't work here because it's somebody who just — Well, that's a very interesting point. I think that the way the collateral source rule applies is that it keeps evidence of the payor out of evidence, yet in this case it's sort of unique because James Taylor was actually — plaintiff introduced it into evidence. So that sort of prong to the collateral source rule obviously doesn't apply here, because it was actually plaintiff wanted the jury to hear that James Taylor is the one who paid the expense, as opposed to the other situation where Blue Cross or something like that, you wouldn't want the jury to hear that. So it really just doesn't apply — I would say that it doesn't apply to our case. The second prong to the collateral source rule is this idea that an injured person should be able to be compensated for the reasonable value of the medical services that are rendered to him. And I would submit that that wasn't an issue at all. We're not arguing that he should somehow get $5 for every $10, or we're not arguing anything about the reasonable value of the medical services. We're arguing Griffin doesn't have standing. Griffin didn't pay it. A third party paid it, who now has a subrogation interest, who literally did absolutely nothing to protect or preserve this subrogation interest. Why should Hickory Hills win out on that when they cost the kid? There's no question the child received the treatment. Why should they get the benefit of that? Well, I suppose if the jury found for the JT on the IIED claim, Hickory Hills would not have gotten the benefit of it. It's not like, like I said, it's not like the reasonable value of medical services weren't available. It's just that JT really — he lost his opportunity via the IIED claim. So, again, it's — Because, counsel, obviously the jury thought — they gave $7,000. Something wrong happened here. Yes, yes. You know, Hickory Hills is the one who shot the dog. The dog was shot. Obviously the child was around for that and saw it was traumatized by that. And so why should Hickory Hills have the windfall because the grandfather stepped in and said, I'm going to pay and didn't, you know, reserve any of the rights that he may have had? I don't necessarily dispute the fact that Hickory Hills shouldn't be given a windfall, or I don't dispute that. I just believe that the collateral source rule really doesn't apply in that regard. The collateral source rule has to do with the reasonable value of medical services. And we can plot a statement that Hickory Hills shouldn't get a windfall, but I don't think that there was any windfall to Hickory Hills. Again, JT was able to put forth the reasonable value of the medical services. We didn't say give him $0.10 for every $0.20 or something like that. We never made that argument. It was directed out. Now, it's also – It was directed out. Oh, I'm sorry. His claim was directed out. Yes. Oh, yes. The jury rejected it. That's exactly right. The family leaves, of course. It's exactly right. You get nothing. Thank you. When I mentioned that, I was actually referring to the IAED claim. There's a case on point saying that they lose, so why don't we just move on? Okay. I would like to mention, however, that the IAED claim there was ample, abundant testimony that the issues that young JT had were really from his domestic situation and Kelly Taylor, who may have had some substance abuse issues and not from the shooting of the dog. Finally, the last comment that I'll make, and I do believe that we might even be able to rest on the brief, is the conversion comment by Judge Starks. Does this panel have any other questions for me? If not, then I would just ask that the jury stand. Thank you very much. Thank you. Mr. Marconi, briefly. I wanted to clear up an area where Justice Steele asked a question about, and that was that communication between the front door and Officer Wiese. And I just wanted to make it clear that there wasn't, first of all, there wasn't a plan about a hand drop. The plan was for Byte to go in the backyard. And I'm reading from the defendant's brief, Officer Wiese's testimony. He said while they were talking to the subject, it appeared that they were allowed entrance into the residence. And then he supposedly drops his hands. He's not privy to that conversation. So he doesn't hear the two of us want to come inside your house. So now if he can't hear what's being said, he doesn't know what's being said, he sees two bodies going inside the house. How can he tell Byte, who's not in sight, of what the scope of consent was or what happened at the front door? He can't. And Officer Byte says, I don't care because I don't need consent. I'm just going to the back to establish a perimeter. So I wanted to make that very clear because there wasn't communication. And I think that's important in this case when it comes to imputing consent in that Ellis case that we talked about earlier. You've got to know what's going on. If he knew what's going on, that's fine. I think the bottom line in this case, and counsel cited the People v. Armstrong, but People v. Armstrong, this court also said that consent to enter doesn't mean consent to search. And I think that the Armstrong case was an Area 1 case where two detectives went there. They were investigating a murder. The homeowner let them into the front foyer area. They took two steps and they see somebody moving in the bathroom, which was right there. And then they had the person step out of the bathtub, it was covered in blood, and they sat him down in the kitchen and then they went from there. That's what Armstrong was. So you can't see they exceeded the scope in that case. But all these other cases, it was an issue. It was an issue of fact for the trial judge to make in these criminal cases. What was the scope of consent? We all are firm believers in the jury system. They can believe or disbelieve any story we're putting to them. My only point in this case is at least give the Griffins a fair shot. At least let me argue to the jury what the law is and let them base their decision on the law as opposed to something that's being made up as we go along in a jury trial, their own formulation of what the law is on the Fourth Amendment. And I think that's the bottom line in this case and why we appeal. These are legal issues. They're not saying that the jury, you know, they have every right in the world to decide what facts they want to believe and what not to believe. So based on the fact that I think a lot of the issues flow from Mr. Griffin's claim, including the child's, that this case needs to go back and allow me to argue what the law is to the jury and let them decide whether or not they believe the child, the father, or the police. The dog was there and Detective Bray saw the dog and it had just come out of the door. So Griffin did the right thing, you know, and that's why we have the Fourth Amendment. Thank you very much. Thank you, Mr. McClellan. Mr. Edwards, this case will be taken under advisement and this Court will be adjourned.